| | |
|---|---|
| DISTRICT COURT, CITY AND COUNTY OF DENVER, STATE OF COLORADO<br>1437 Bannock Street<br>Denver, CO 80202 | DATE FILED: April 6, 2022 9:02 AM<br>FILING ID: 8278D61D47D4C<br>CASE NUMBER: 2022CV30943 |
| **Plaintiff: Erin Maxwell**<br>v.<br>**Defendants: Advanced Sterilization Products, Inc., a Delaware corporation** | ▲COURT USE ONLY▲ |
| Attorneys for Plaintiff:<br>Kevin D. Allen, #8878<br>Jennifer Schlatter #30626<br>ALLEN VELLONE WOLF HELFRICH & FACTOR, P.C.<br>1600 Stout Street, Suite 1900<br>Denver, Colorado 80202<br>Phone Number: (303) 534-4499<br>E-mail: kallen@allen-vellone.com<br>E-mail: jschlatter@allen-vellone.com | Case Number:<br><br>Division/Courtroom: |
| **COMPLAINT** ||

Plaintiff Erin Maxwell ("Maxwell"), by and through her counsel, Allen Vellone Wolf Helfrich & Factor, P.C., for her complaint against Defendant Advanced Sterilization Products, Inc. ("ASP"), states as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. Maxwell is a resident of the State of Colorado.

2. ASP is a Delaware corporation with its principal place of business located at 33 Technology Dr., Irvine, CA 92618.

3. This Court has jurisdiction in this matter pursuant to C.R.S. § 13-1-124 because this matter arises out of an employment relationship wherein the Colorado employee's services were to be performed in Colorado.

4. Venue is appropriate pursuant to C.R.C.P. Rule 98(c).

## BACKGROUND AND GENERAL ALLEGATIONS

5. ASP is a medical devices company that provides infection prevention services. ASP is a subsidiary of Fortive Corporation ("Fortive"). ASP markets and sells sterilization and high level disinfections products, as well as software which enhances instrument tracking products.

6. Maxwell previously served as the Regional Sales Director for the Mountain South region of ASP.

7. Maxwell had been employed with ASP and its predecessor, Johnson and Johnson, in sales of sterilization products since 2012, and had been a top performer throughout her career with the companies.

8. Maxwell was terminated from employment by ASP at the end of 2021.

9. She was terminated as a result of her filing a Speak Up complaint pursuant to the Fortive "Speak Up" Roadmap, one of several complaints Maxwell had raised throughout 2021 regarding company activities.

10. The "Speak Up" Roadmap is part of the personnel policies utilized by ASP to ensure that its employees are able to raise concerns regarding, *inter alia*, company standards of conduct, or possible legal or regulatory violations, without fear of retaliation by ASP for doing so.

11. These assurances exist in various provisions of the ASP US Employee handbook, the Fortive Standards of Conduct, and a US Government Contracting Code of Business Ethics and Conduct ("Code of Ethics").

12. Pursuant to the "Speak Up" Roadmap as set forth in the Employee Handbook:

> Employees are encouraged and expected to ask questions when unsure about any integrity or compliance issue, and are required to report actual or potential violations of law, our Standards of Conduct or other ASP policy. In bringing questions or violations to a manager's attention, you help to ensure ASP achieves and sustains the highest levels of integrity and compliance, and you are help build the foundation of our future success.

13. In addition, the "Speak Up" Roadmap provides that ASP has "zero tolerance for retaliation against any associate who has raised a concern in good faith regardless whether a report uncovers any actual misconduct."

14. The ASP Employee Handbook further provides that "retaliation is strictly prohibited," and that "ASP prohibits retaliation against any employee who, in good faith, reports potential or actual violations of the Equal Employment Opportunity policy, Anti-Harassment and Non-Discrimination policy, Standards of Conduct, or applicable law."

15. ASP is a government contractor which is subject to key legal compliance requirements applicable to its government contract activities. Specifically, ASP is subject to various healthcare related laws regulating fraud and abuse, research and development, pricing and sales and marketing practices, and the privacy and security of health information.

16. ASP maintains the Code of Ethics, which outlines its compliance requirements. Pursuant to the Code of Ethics. ASP is committed to ensuring that all transactions and other business dealings with its prime contractors, subcontractors, and suppliers are in accordance with the highest standards of business ethics and the provisions of Government Contract Business Ethics and Conduct [February 10, 2020] Document Version: 1.0 11 Release Date: [2/10/2020] of the Anti-Kickback Act of 1986, 41 U.S.C. § 8701 *et. seq*.

17. The term "kickback" is defined very broadly to include: money, fee, commission, credit, gift, gratuity, thing of value, loan, entertainment, services, or compensation of any kind that is provided, directly or indirectly, to any prime contractor, prime contractor employee, subcontractor, or subcontractor employee for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract with the United States or a subcontract in connection with a prime contract with the United States.

18. In addition, in connection with contract awards and modifications, the ASP Code of Ethics references the requirement that ASP provide historical pricing information (including commercial sales practices and commercial or government sales history) to the government to allow it to compare such information to the pricing offered by ASP and to negotiate a "fair and reasonable" price, and that ASP employees must understand that these requirements are to be taken very seriously.

19. The Code of Ethics also states that ASP employees who report violations and potential violations will be treated with respect. ASP's Compliance Team will lead all investigations of alleged violations or misconduct with fairness and impartiality, and ASP employees will never be penalized for reporting in good faith.

20. A violation of ASP's non-retaliation policy will lead to discipline, including termination for those who engage in such violations. If an employee suspects someone is retaliating against them, the employee is encouraged to contact one of several resources.

21. Starting in or around February 2021, Maxwell raised compliance concerns with her superior, Doug Brooks ("Brooks") related to an offer of pricing made by another ASP employee, the Corporate Accounts Director, that was in violation of agreements in place with a particular customer. These concerns were raised in response to direction Maxwell had received from ASP to offer lower pricing to a group of hospitals without proper internal or external approvals, since any pricing offer that deviated from this particular customer required a signed amendment. Specifically, Maxwell was concerned the offer of pricing was in violation of anti-kickback regulations.

22. Maxwell was told that the decisions made were allegedly in the best interest of the business, that she should follow the direction of the Corporate Accounts Director to offer pricing that violated the terms of ASP agreements with the customer "even if [she] didn't like it."

23. Maxwell also reported concerns to Brooks that she was the subject of harassment by other ASP employees as a result of her reporting compliance concerns.

24. Brooks informed Maxwell that he would look into her concerns.

25. After reporting her concerns, Brooks and Elle Wilson ("Wilson"), a Human Resource Department ("HR") representative, retaliated against her, which retaliation included Brooks alleging in June 2021 that Brooks had "received complaints" regarding certain behavior of Maxwell.

26. The only follow up on the alleged complaints against Maxwell occurred in August 2021, wherein she was informed by Brooks that the concerns previously communicated to her had been fully resolved. Indeed, between June through her termination, no performance related concerns were ever addressed with Maxwell.

27. Maxwell's concerns regarding compliance issues relating to ASP's failure to comply with its policies continued in the fall of 2021, specifically in relation to promotional pricing offered to a particular customer.

28. As a result of concerns by other employees, led by Melissa Linderman, regarding promotional pricing offered to the customer, Maxwell in September attempted to intervene on their behalf and eventually reported the matters to Brooks on November 9, 2021.

29. In a subsequently scheduled status call with Brooks on November 12, 2021, he informed Maxwell that he had reported her concerns to ASP Compliance and HR.

30. Not having heard from either Compliance or HR, Maxwell communicated in writing on November 15, 2021 to the ASP Regional Compliance Leader, Ximena Cajas Gonzalez ("Cajas Gonzalez"), who then scheduled a confidential call with Maxwell on November 16, 2021. As a result of that call, Cajas Gonzalez was to reach out to Linderman. Maxwell heard nothing further on the Compliance Department contacts, if any, with Linderman.

31. On November 17, 2021, Wilson scheduled a call with Maxwell. On that call, Maxwell raised all of her concerns relative to the promotional pricing issues, the prior issues she had raised, her fear of retaliation and the response of the company, including Brooks' attitude toward compliance. Wilson stated that Brooks' attitude was unlikely to change. She also asked Maxwell whether she would be interested in an "exit plan" to leave the company.

32. As Maxwell perceived retaliation was continuing, and having no other choice, she submitted a Speak Up Complaint on November 20, 2021, which detailed her prior reporting of

compliance concerns relating to ASP's failure to follow its pricing and anti-kickback policies in relation to certain transactions during 2021, starting in February.

33. As a result of the November 20 complaint, Maxwell then met with Cajas Gonzalez, who was charged with investigating it.

34. Maxwell and Cajas Gonzalez met on November 22, at which time Cajas Gonzalez informed Maxwell not to submit any further "Speak Up" complaints. She also informed Maxwell that she would conduct an investigation of the complaint, and report back to Maxwell. She never did. Instead, Maxwell became aware on December 13 that the promotional credit referenced above had been approved by the company.

35. Maxwell was terminated from her position on December 17, 2021 in a telephone call with Brooks and Estelle Pellegrino ("Pellegrino") of HR, who at that point had held her HR position for approximately one week. Her termination was effective December 31, 2021.

36. Maxwell was told that the company was eliminating her Regional Sales Director position. No performance issues were referenced.

37. Maxwell inquired into whether this termination related to her Speak Up complaint. Brooks didn't answer. Pellegrino said, "we have a fair process."

38. At that time of her termination, Maxwell was presented with a Separation Agreement and General Release, which purports to provide her the same severance pay as provided to any other employee pursuant to the Salaried Employees Severance Pay Plan of Fortive Corporation.

39. As Maxwell was tendered a Separation Agreement at the time of her separation, her termination is presumed to be without cause.

40. The pricing and anti-kickback complaints raised by Maxwell during 2021 fell squarely within the compliance requirements imposed on ASP as outlined in its Code of Ethics, and in the underlying policies and guidance of ASP, including the 2021 H2 Pricing & Promotions policies. Her reporting of retaliation for raising these issues was also done in a manner consistent with reporting policies set forth in the Code of Ethics. For doing so, Maxwell was fired.

41. Maxwell has subsequently determined that a number of new Regional Sales Manager positions are being created in her region, and that her Regional Sales Director position has not been eliminated.

42. Instead, the job description for the Regional Sales Manager is nearly identical to the one for Maxwell's prior role as Regional Sales Director. Moreover, three other Regional Sales Directors have been promoted to Area Vice Presidents, a newly created title in the sales organization.

43. As a result of her wrongful and unjustified termination from employment, Maxwell has suffered and will continue to suffer lost income and other damages, both pecuniary and non-pecuniary, which includes anticipated salary and commissions for calendar year 2022, the value of her anticipated annual and one time equity award for the year, the value of any cancelled stock options or RSUs lost as a result of her termination, and compensatory damages relating to the distress, worry and other emotional consequences of abruptly losing her job in this manner.

44. In addition to the damages caused by Maxwell's wrongful and unjustified termination from employment, Maxwell is owed earned, vested and determinable compensation through the date of her termination. This includes 1) Sales Incentives/Awards relating to calendar year 2021 valued at up to $25,000, 2) commissions for capital orders valued at approximately $2.7m expected to ship in December, 2021 upon which Maxwell is entitled to commissions under her commission plan, which provides for commissions on product payments received thirty days past her separation date, and 3) 2021 commission reconciliations, which are typically paid in March.

## FIRST CLAIM FOR RELIEF
### (Breach of Implied Contract)

45. Plaintiff re-alleges and incorporates by reference the forgoing paragraphs as though fully set forth herein.

46. As part of her employment, Plaintiff executed the ASP U.S. Employee Handbook, which incorporates Fortive Standards of Conduct and the Fortive "Speak Up" Roadmap. ASP further implements the US Government Contracting Code of Business Ethics and Conduct, which outlines its key compliance requirements.

47. The personnel policies utilized by ASP ensure that its employees are able to raise concerns regarding, *inter alia*, company standards of conduct, or possible legal or regulatory violations, without fear of retaliation by ASP for doing so.

48. ASP is subject to the provisions of the Handbook, Standards of Conduct, "Speak Up" Roadmap, and Contracting Code.

49. By implementing the various policies and procedures, and further informing Plaintiff that ASP would investigate and take action in response to Plaintiff's concerns and complaints, ASP demonstrated a willingness to be bound by its policies and procedures, including the Handbook, Standards of Conduct and "Speak Up" Roadmap.

50. The policies and procedures implemented by ASP, as well as the Code of Business Ethics and Conduct, imposed a duty on Plaintiff to notify ASP of any violations of such policies and procedures, and further created an implicit contract or promise that ASP will not retaliate against the individual who has notified management of such violations.

51. Plaintiff reasonably understood that ASP was offering these policies as part of the terms, conditions and duties of her employment with ASP.

52. ASP breached its implied contract and promise of protection against retaliation by terminating Plaintiff for complying with the requirement to report violations of such policies and procedures.

53. Until her termination, Plaintiff performed her duties in a satisfactory manner.

54. As a result of Defendant's breach, Plaintiff has suffered and continues to suffer damages in amounts to be proven at trial.

## SECOND CLAIM FOR RELIEF
### (Wrongful Termination)

55. Plaintiff re-alleges and incorporates by reference the foregoing paragraphs as though fully set forth herein.

56. During the course of her employment with ASP, Plaintiff internally objected to illegal practices in which she believed ASP was engaging.

57. In particular, Plaintiff raised internal objections to her supervisors relating to ASP's noncompliance with anti-kickback statutes and those governing discount pricing, including allocation of retroactive credits.

58. Despite her objections, Plaintiff was given directives to comply with the practices.

59. Plaintiff engaged in protected activities by bringing to ASP's attention government compliance concerns, including the submission of a Speak Up Complaint in accordance with company policies.

60. ASP terminated Plaintiff as a direct and proximate result of her reporting her concerns and filing her complaint regarding the government compliance concerns as set forth above.

61. ASP's termination of Plaintiff's violates established public policy of the State of Colorado that an employer may not retaliate against an employee who attempts to prevent an employer's participation in an act that violates a law or rules and regulations of the United States.

62. Plaintiff had a right or duty based upon expressed public policy to object to what she believed in good faith was illegal activity as described more fully herein.

63. Defendant was aware or reasonably should have been aware that Plaintiff's actions were legally protected.

64. ASP terminated Plaintiff in retaliation of Plaintiff having complied with her legal and ethical duties, as detailed in the sources of public policy outlined above.

65. ASP's termination of Plaintiff violates public policy.

66. The actions of Defendant were willful and wanton, and/or were done with malice or with reckless indifference to Plaintiff's protected rights.

67. As a result of ASP's wrongful termination of Plaintiff in violation of public policy, Plaintiff suffered and continues to suffer damages in the amount to be proven at trial.

### THIRD CLAIM FOR RELIEF
### (Violation of Colorado Wage Claim Act, C.R.S. § 8-4-101, *et. seq*)

68. Plaintiff re-alleges and incorporates by reference the foregoing paragraphs as though fully set forth herein.

69. At all material times, ASP has been an "employer" within the meaning of the Colorado Wage Claim Act.

70. Plaintiff was an employee of ASP within the meaning of the Colorado Wage Claim Act.

71. Pursuant to the provisions of C.R.S. § 8-4-109(3), Plaintiff made written demand for payment of wages or compensation.

72. Despite this demand, Defendant has failed and refused to pay Plaintiff all earned, vested and determinable wages or compensation for labor or services, including sales incentives/awards and commissions.

73. Defendant's failure to pay wages owed is willful and wanton.

74. As a result of the foregoing, Plaintiff is entitled to statutory penalties pursuant to C.R.S. § 8-4-109(3)(b) and (c)**.**

75. As a consequence of the foregoing, Plaintiff is also entitled to recover her attorneys' fees and costs.

WHEREFORE, Maxwell prays for relief as follows:

A. Judgment against Defendant on all claims asserted against it;

B. An award of backpay, front pay, and compensatory damages in an amount to be determined at trial;

C. Unpaid wages and other benefits in an amount to be determined at trial;

D. Statutory penalties under Colorado Wage Act, C.R.S. § 8-4-109 (3)(b) and (c);

E. An award of attorneys' fees and costs pursuant to C.R.S. § 8-4-110;

F. Pre- and post-judgment interest; and

G. Such other relief deemed just and reasonable

**PLAINTIFF DEMANDS A JURY ON ALL ISSUES SO TRIABLE**

DATED this 16th day of March, 2022.

        Respectfully Submitted,

        ALLEN VELLONE WOLF HELFRICH & FACTOR P.C.

        By: *s/Kevin D. Allen*
           Kevin D. Allen
           Jennifer Schlatter
           1600 Stout Street, Suite 1900
           Denver, Colorado 80202
           (303) 534-4499
           E-mail: kallen@allen-vellone.com
           E-mail: jjonsen@allen-vellone.com

        ATTORNEYS FOR THE PLAINTIFF

<u>Plaintiff's Address</u>:
4895 E. 41st Ave.
Denver, CO 80216