IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge S. Kato Crews

Civil Action No. 1:22-cv-00894-SKC

ERIN MAXWELL,

    Plaintiff,

v.

ADVANCED STERILIZATION PRODUCTS, INC.,

    Defendant.

## ORDER RE: MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS

This matter is before the Court on Defendant Advanced Sterilization Products, Inc.'s[1] Motion for Partial Judgment on the Pleadings ("Motion") under Fed. R. Civ. P. 12(c). Dkt. 29.[2] Defendant moves for judgment on the pleadings as it pertains to Plaintiff Erin Maxwell's first and second claim in the Complaint. Defendant argues that (1) Plaintiff's claim for breach of an implied contract is facially void because Defendant's written policies contain no more than aspirational language with clear

---

[1] Defendant, in its Answer to the Complaint, states that Plaintiff incorrectly named the company. Defendant's correct name is "Advanced Sterilization Products Services Inc."

[2] The Court uses "Dkt. __" to refer to specific docket entries in CM/ECF.

1

disclaimers, and (2) Plaintiff's wrongful termination claim based on public policy fails because Plaintiff does not identify an actionable public policy. *Id.* at p. 1-2.

Following the parties' consent, the case was referred to this Court for all purposes pursuant to 28 U.S.C. § 636(c). Dkt. 16. The Court has carefully considered the Complaint (Dkt. 5), Defendant's Motion for Partial Judgment on the Pleadings (Dkt. 29), Plaintiff's Response (Dkt. 33), Defendant's Reply (Dkt. 37), and applicable law. A hearing is unnecessary.

Because the Court finds the *only* implied-contract theories that are plausibly alleged in the Complaint are implied contracts based on Defendant's Standards of Conduct and Code of Ethics, the Motion is PARTIALLY GRANTED and PARTIALLY DENIED as to this claim. And because the Complaint fails to plausibly allege an appropriate source of public policy, the Motion is GRANTED as to the wrongful discharge claim.

## A. BACKGROUND[3]

Defendant, a subsidiary of Fortive Corporation ("Fortive"), is a medical-device company that provides infection prevention services. Dkt. 5 at ¶ 5. Defendant and its predecessor, Johnson and Johnson, hired Plaintiff in 2012. *Id.* at ¶ 7. Prior to her discharge from Defendant, Plaintiff worked as a Regional Sales Director. *Id.* at ¶ 6.

---

[3] For purposes of the Background, the Court accepts the well-pleaded facts in the Complaint as true and views the allegations in the light most favorable to the non-movant. *Casanova v. Ulibarri*, 595 F.3d 1120, 1124-25 (10th Cir. 2010).

During her employment, Defendant gave Plaintiff an Employee Handbook ("Handbook"), Fortive Standards of Conduct ("Standards of Conduct"), and a U.S. Government Contracting Code of Business Ethics and Conduct ("Code of Ethics"). *Id.* at ¶ 11. Plaintiff alleges these policies prevent retaliation in the workplace by establishing an employee reporting process known as "Speak Up." *Id.* at ¶ 10-13.

In about February 2021, Plaintiff raised compliance concerns with her superior, Doug Brooks ("Brooks"), relating to pricing offered to a customer that she believed violated certain agreements with the customer. *Id.* at ¶ 21. According to Plaintiff, a Corporate Accounts Director instructed her to offer lower pricing to a customer without proper internal or external approvals. *Id.* Plaintiff expressed concerns to Brooks that doing so violated anti-kickback regulations. *Id.* She alleges that Brooks dismissed her concerns and told her to follow the direction of the Corporate Accounts Director. *Id.* at ¶ 22. Plaintiff also reported additional concerns to Brooks that she was being harassed by other employees for having reported her compliance concerns. *Id.* at ¶ 23. Brooks stated he would investigate these issues. *Id.* at ¶ 24.

In June 2021, Brooks and a representative from the Human Resources Department ("HR"), Elle Wilson ("Wilson"), told Plaintiff they received complaints regarding her behavior. *Id.* at ¶ 25. In response, Plaintiff argued she was being retaliated against for reporting her compliance concerns. *Id.* In August 2021, she was

then told the concerns others raised about her behavior had been resolved. *Id.* at ¶ 26.

In September 2021, Plaintiff continued to have compliance concerns. *Id.* at ¶ 28. On November 9, 2021, she reported her concerns to Brooks, who called Plaintiff on November 12 and told her that Brooks reported her concerns to the Compliance Department and HR. *Id.* at ¶ 29. On November 15, Plaintiff wrote to the Regional Compliance Leader, Ximena Cajas Gonzalez ("Cajas Gonzalez"), who then scheduled a confidential call with Plaintiff on November 16. *Id.* at ¶ 30. Then, on November 17, 2021, Wilson scheduled a call with Plaintiff in which she asked Plaintiff if she was interested in an "exit plan" to leave the company. *Id.* at ¶ 31.

Following these events, on November 20, 2021, Plaintiff submitted a Speak Up Complaint because she believed she was the subject of retaliation. *Id.* at ¶ 32. When Plaintiff met with Cajas Gonzalez on November 22, 2021, he told her an investigation would occur and that he would report back to her. *Id.* at ¶ 34. But Plaintiff never heard back. *Id.* Instead, on December 17, 2021, Brooks and HR representative Estelle Pellegrino ("Pellegrino") terminated Plaintiff's employment during a telephone call, citing elimination of her job as the reason. *Id.* at ¶¶ 35, 36. Her termination was effective December 31, 2021. *Id.*

Plaintiff subsequently sued Defendant asserting claims for breach of implied contract, wrongful termination in violation of public policy, and a violation of the Colorado Wage Claim Act. *Id.* at ¶¶ 52, 65, 72. Defendant moves for judgment on the

4

pleadings as it pertains to the claim for breach of an implied contract and the wrongful termination claim. *Id.* at p. 1-2.

### B. LEGAL PRINCIPLES

"After the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings contends that the moving party is entitled to judgment based on the pleadings alone; the court, therefore, is typically limited to an examination of the sufficiency of the pleadings. *Id.* But a court may also consider written documents attached to the complaint or answer, and any matter of which the court can take judicial notice for the factual background of the case. *Tuttle v. Nationwide Affinity Ins. Co. of Am.*, No. 19-cv-00526-NYW, 2019 WL 2208513, at *2 (D. Colo. May 22, 2019).

A judgment on the pleadings should not be granted "unless the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law." *Park Univ. Enters., Inc. v. Am. Cas. Co. of Reading, Pa.*, 442 F.3d 1239, 1244 (10th Cir. 2006) (internal quotations omitted), *abgrogated on other grounds by Magnus, Inc. v. Diamond State Ins. Co.*, 545 F. App'x 750, 753 (10th Cir. 2013). A motion for a judgment on the pleadings "only has utility when all material allegations of fact are admitted or not controverted in the pleadings and only questions of law remain to be decided by the district court."

5C Charles Alan Wright et al., Federal Practice & Procedure § 1367 (3d ed., Apr. 2019 update).

"A motion for judgment on the pleadings under Rule 12(c) is treated as a motion to dismiss under Rule 12(b)(6)." *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir. 2000). As such, a court may dismiss a complaint for failure to state a plausible claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6); *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007).

## C. DISCUSSION

### 1. Breach of Implied Contract Claim

In support of her claim for breach of implied contract, Plaintiff relies on Defendant's "U.S. Employee Handbook, which incorporates Fortive Standards of Conduct and the Fortive 'Speak Up' Roadmap[, and] the US Government Contracting Code of Business Ethics and Conduct[.]" Dkt. 5 at ¶46. She alleges that these "policies and procedures" "imposed a duty on Plaintiff to notify ASP of any violations of such policies and procedures, and further created an implicit contract or promise that ASP will not retaliate against the individual who has notified management of such violations." *Id.* at ¶50. She then alleges Defendant "breached its implied contract and promise of protection against retaliation by terminating Plaintiff for complying with the requirement to report violations of such policies and procedures." *Id.* at ¶52.

Defendant argues it cannot be contractually bound because its policies and procedures contain multiple contractual disclaimers. Dkt. 29, p. 5. It further argues its policies and procedures contain mere aspirational language lacking any explicit promise or commitment. *Id.* at p. 8. Defendant contends, as a matter of law, no contract exists implied or otherwise.

An implied contract may arise out of an employment manual, handbook or any other document reflecting company policy. *Vasey v. Martin Marietta Corp.*, 29 F.3d 1460, 1464 (10th Cir. 1994). To succeed on an implied contract theory, an employee must show: (1) "the employer's actions manifested an intent to be bound by the provisions of that document [;]" and (2) "that the offer was accepted and consideration provided by simply indicating that their continued employment with the company could at least reasonably have been motivated by the terms of the offer." *Frymier v. Ampex Corp.*, 61 F.3d 757, 769-70 (10th Cir. 1995). To establish an employer's binding intent (factor 1), the terms of the offer must be "communicated to all employees," "sufficiently definite and detailed," and "the offer must not include a disclaimer provision." *Id.*

Plaintiff asserts Defendant made offers of no-retaliation in multiple documents, including: (1) in the Employee Handbook; (2) in the Standards of Conduct; and (3) in the Code of Ethics. The Court has reviewed and considered these policy documents, and may do so without converting the Motion to a motion for summary judgment because these policies are alleged in the Complaint and are central to

7

Plaintiff's claims. *U.S. Olympic Comm. v. Am. Media, Inc.*, 156 F. Supp. 2d 1200, 1204 (D. Colo. 2001).

    a. The Handbook

If an employer includes a clear and conspicuous disclaimer in an employee handbook indicating the employer did not intend to create a contract, the disclaimer can void indications that an employer is bound to comply with certain policies. *Anderson v. Regis Corp.*, 185 F. App'x 768, 771 (10th Cir. 2006). Courts in the Tenth Circuit have repeatedly held such disclaimers to be effective in precluding a claim based on an implied contract. *See, e.g.*, *Jones v. Denver Pub. Sch.*, 427 F.3d 1315, 1324 (10th Cir. 2005); *Vance v. TOLMAR, Inc.*, 2018 WL 1456275, at *8 (D. Colo. Mar. 23, 2018).

Plaintiff's Complaint fails to plead a claim for breach of implied contract that relies on the Handbook. The Handbook contains guidelines to help employees understand their workplace and work expectations. Dkt. 33-7 at ¶ 3. As a matter of law, the Handbook does not constitute an implied contract between the parties because it contains an explicit disclaimer that it is neither a contract of employment nor a legal document. Dkt. 29-1, p. 5. Such a disclaimer by Defendant is effective in precluding a claim based on an implied contract theory. *Jones*, 427 F.3d at 1324; *Vance,* 2018 WL 1456275, at *8. Therefore, as a matter of law, the Handbook cannot be used to plausibly allege this claim.

b. <u>The Standards of Conduct</u>[4]

The Standards of Conduct is a resource to help employees operate with integrity. Dkt. 33-2 at ¶ 3. In considering this document, the Court finds the Complaint plausibly alleges this policy supports a breach of implied contract, at least at this stage of the Court's consideration.

To establish Defendant's binding intent, Plaintiff cites the Standards of Conduct's specific language regarding Defendant's no-retaliation policy. Dkt. 5 at ¶ 12, 14 (*e.g.*, "ASP prohibits retaliation").[5] And the Court notes the Standards of Conduct expressly provide: "Remind them of our zero tolerance policy on retaliation." (Dkt. 33-2 at p.14); "We are Courageous. As employees, we face problems head on and promptly report any behavior that we believe violates our Core Values or our Code, knowing that Fortive will not tolerate retaliation." (*Id.* at p.17); "Don't Fear Retaliation. . .. Fortive absolutely prohibits retaliation against anyone who makes a report or participates in an investigation." (*Id.* at p.18). This language in the

---

[4] While Plaintiff alleges the Handbook "incorporates" the Standards of Conduct and Code of Ethics, Dkt. 5 at ¶ 46, the Handbook instead indicates the Standards of Conduct are "in addition to" the Handbook. Dkt. 33-7 at p.3. The Court, therefore, construes the Standards of Conduct as a policy document separate and apart from the Handbook. And because the Code of Ethics is referred to as a "supplement" to the Standards of Conduct, Dkt. 29-3 p. 2, it too stands alone (or possibly together with the Standards of Conduct). Lastly, the "Speak Up" Roadmap alleged in the Complaint, is part-and-parcel of the Standards of Conduct. *See generally* Dkt. 33-2.

[5] The Complaint primarily cites to the Handbook, which the Court has found insufficient. However, the Complaint alleges that similar assurances exist in the Standards of Conduct (Dkt. 5 at ¶ 11).

Standards of Conduct is definite and detailed, rather than vague and aspirational. *See Frymier*, 61 F.3d at 770 ("The manual included a specific schedule of benefits and employed language that strongly indicated Ampex's intention to be bound."). Furthermore, the Complaint plausibly alleges that the terms in the Standards of Conduct are communicated to all employees. Dkt. 5 at ¶ 47.

The parties dispute which of two versions of the Standards of Conduct (2016 or 2020) is applicable to this case. In Defendant's Motion, it refers to the 2016 version (Dkt. 29-2), while Plaintiff's Response refers to the 2020 version. Dkt. 33-2. The 2016 version apparently contains a disclaimer, while the 2020 version does not. Viewing the facts in the light most favorable to the non-movant, the Complaint plausibly alleges that the Standards of Conduct contain no disclaimer, which is supported by the 2020 version of the document. Dkt. 5 at ¶ 49; *cf. Peru v. T-Mobile USA, Inc.*, 897 F. Supp. 2d 1078, 1087 ("this language clearly and unambiguously advises employees that T-Mobile's statements of policies may be 'modified or disregarded' at any point, purely at T-Mobile's discretion. Accordingly, such policies cannot amount to a promise enforceable."). Finally, the Complaint plausibly asserts that Plaintiff's continued employment could at least reasonably have been motivated by the terms of the implied contract. *Id.* at ¶ 51. For these reasons, Plaintiff has plausibly alleged a breach of implied contract claim based on the 2020 Standards of Conduct.

### c. The Code of Ethics

The Code of Ethics outlines compliance requirements. *Id.* at ¶ 16. Because it is intended to supplement the Standards of Conduct, the Court views it in the same manner as the 2020 Standards of Conduct. Dkt. 29-3 p. 2.

The Complaint points to language from the Code of Ethics that plausibly alleges a breach of implied contract claim. *Id.* at p. 3; Dkt. 5 at ¶ 20 ("A violation of ASP's non-retaliation policy will lead to discipline, including termination." "If [an employee] suspects someone is retaliating against [them], [the employee] should contact one of the resources[.]"). Even further, the Code of Ethics contains this express language: "ASP employees who report violations and potential violations will be treated with respect. . ... ASP employees will never be penalized for reporting in good faith." Dkt. 29-3 at p.3. This language is not vague and aspirational, as Defendant contends. Further, like the Standards of Conduct, there is no disclaimer in the Code of Ethics. As such, Plaintiff's allegations are sufficient, at the pleading stage, to support a claim for breach of an implied contract not to retaliate against Plaintiff for complying with the Standards of Conduct and the Code of Ethics.

### 2. **Wrongful Termination Claim**

Plaintiff argues her termination "violates established public policy of the State of Colorado that an employer may not retaliate against an employee who attempts to prevent an employer's participation in an act that violates a law or rule and regulations of the United States." Dkt. 5 at ¶ 61. Defendant argues Plaintiff fails to

mention what specific public policy Defendant violated, and only makes passing reference to anti-kickback statutes. *Id.* at ¶ 57; Dkt. 29 at p. 2. Defendant asserts further that private policies cannot be used to establish a public policy claim, and Plaintiff has failed to sufficiently identify a specific public policy. Dkt. 29, p. 11. The Court agrees with Defendant, and therefore, grants the motion with regard to the wrongful termination claim.

"Colorado recognizes both state *and* federal mandates as 'public policy' that properly supports a wrongful discharge claim." *Cejka v. Vectrus Sys. Corp.*, 291 F. Supp. 3d 1231, 1245 (D. Colo. 2018). A claim for wrongful discharge is "a limited exception to at-will employment insofar as an employee who is discharged in violation of a clearly-established public policy may challenge her termination." *Peru*, 897 F. Supp. 2d at 1087. The underlying rationale of the public-policy exception to termination of an at-will employee "is to prohibit an employer from placing an employee in the position of keeping a job only by performing an illegal act, forsaking a public duty, or foregoing a job-related right or privilege." *Martin Marietta Corp. v. Lorenz,* 823 P.2d 100, 109 (Colo. 1992).

Both parties assume and discuss the *prima facie* case for wrongful termination in violation of public policy based on the theory of a plaintiff's refusal to comply with her employer's unlawful directive. *See Lawson v. Heartland Payment Sys., LLC*, 548 F. Supp. 3d 1085, 1090 (D. Colo. 2020); *Rocky Mountain Hospital & Medical Services v. Mariani,* 916 P.2d 519 (Colo. 1996). Namely, the allegation that Plaintiff objected

12

to the Corporate Accounts Director's request for a pricing discount to a customer that Plaintiff believed violated the law. Dkt. 5 at ¶ 21-22, 56, 61 (*e.g.*, "Plaintiff internally objected to illegal practices in which she believed ASP was engaging."). But the Complaint instead pleads the claim based on the theory that Plaintiff was discharged for having exercised a right or having performed a public duty. *See id.* at ¶ 60 ("ASP terminated Plaintiff as a direct and proximate result of her reporting her concerns and filing her complaint regarding the government compliance concerns as set forth above."). She even argues this theory in her Response while citing the wrong *prima facie* case. Dkt. 33 at p. 15 (*e.g.*, "Maxwell was terminated as a result of exercising her right to report potential ethical violations without any retaliation."). This matters generally because claims for wrongful discharge in violation of public policy that are premised on the exercise of a right or public duty have a different *prima facie* case. *See Lathrop v. Entenmann's, Inc.*, 770 P.2d 1367, 1373 (Colo. App. 1989); *Kearl v. Portage Envtl., Inc.*, 205 P.3d 496, 499 (Colo. App. 2008). But the distinction is of no matter here because, under either *prima facie* case, the Complaint fails to plausibly allege an appropriate source of public policy.

    a. <u>Anti-Kickback Statute</u>

The Complaint only generally and loosely references Defendant's alleged noncompliance with "anti-kickback statutes" or "anti-kickback regulations." Dkt. 5 at ¶¶21, 57. While the Complaint does identify the Anti-Kickback Act of 1986, 41 U.S.C. § 8701 *et seq.*, Plaintiff fails to plead what aspects of the Act she complained about to

13

determine whether she plausibly alleged a requisite public policy.[6] For example, with only general mentions of anti-kickback regulations or statutes in the Complaint, the Plaintiff then defines the term "kickback" using a definition contained in Defendant's *internal* policies. Dkt. 5 at ¶ 17. And while she cites 41 U.S.C. §§ 1303(a)(1) and 1121(b) in her Response, Plaintiff cannot amend her Complaint with her Response. *Sudduth v. Citimortgage, Inc.*, 79 F. Supp. 3d 1193, 1198 (D. Colo. 2015) ("Plaintiffs cannot amend their complaint by adding factual allegations in response to [a] motion to dismiss.").

As a result, Plaintiff's statements regarding the wrongful termination claim are conclusory at best and cannot be afforded weight by the Court. *See, e.g., id.* at ¶ 65 ("ASP's termination of Plaintiff violates public policy."). Under the *Twombly-Iqbal* standard, the Court will disregard conclusory statements and only look to the remaining, well-pleaded factual allegations. When doing so, the Court struggles to find sufficient factual allegations to support Plaintiff's wrongful termination claim. Since "[n]ot all potential sources of public policy are of sufficient gravity to outweigh the precepts of at-will employment," *Crawford Rehab. Servs., Inc. v. Weissman*, 938

---

[6] The Complaint, in ¶ 16, generally cites the Anti-Kickback *Act* of 1986, 41 U.S.C. § 8701 *et seq*. For some reason, in its Motion, Defendant instead cites and discusses the Anti-Kickback *Statute*, 42 U.S.C. § 1320a-7b, which is different and not mentioned in the Complaint, nor in Plaintiff's Response. *See United States ex rel. Haight v. RRSA (Com. Div.), LLC*, No. 3:16-CV-1975-S, 2020 WL 6163139, at *5, n. 12 (N.D. Tex. Oct. 20, 2020) ("The Anti-Kickback Act, 41 U.S.C. § 8702 *et seq.*, must be distinguished from the Anti-Kickback Statute ('AKS'), 42 U.S.C. § 1320a *et seq.*, which can form the basis of an [False Claims Act] claim in the healthcare context.").

14

P.2d 540, 553 (Colo. 1997), Plaintiff must allege more than general references to anti-kickback regulations or statutes. Indeed, she must allege sufficient facts to plausibly establish a clearly expressed public policy relating to her basic rights or duties as an employee. *Id.* ("[W]e discern no clearly expressed public policy relating to an employee's basic rights or duties.").

For these reasons, Plaintiff has failed to plausibly allege a clearly expressed public policy based on anti-kickback regulations or statutes to sustain this claim.

b. <u>Internal Policy</u>

Colorado courts have held that private employment codes are not considered public policy. *See Jaynes v. Centura Health Corp.*, 148 P.3d 241, 245 (Colo. App. 2006) ("But we need not resolve that dispute because the ANA Code and the AACN Policy are purely private pronouncements, violation of which subjects a nurse to no adverse consequences. Recognizing such pronouncements as embodiments of public policy sufficient to sustain a wrongful discharge claim would extend *Mariani*, which we decline to do."). This is because "[t]he General Assembly is the branch of government charged with creating public policies, and the courts may only recognize and enforce such policies." *Crawford Rehab. Servs., Inc. v. Weissman,* 938 P.2d 540, 553 (Colo. 1997) ("*Weissman*").

Plaintiff's allegations that attempt to make public policy out of Defendant's private policies fail to state a claim as a matter of law. Public policy "must concern behavior that truly impacts the public in order to justify interference into an

15

employer's business decisions." *Weissman*, 938 P.2d at 552 (internal citation omitted). Thus, Plaintiff's citation to internal policies fails to sufficiently allege a wrongful termination claim as a matter of law.

\* \* \*

For the reasons share above, the Court ORDERS the Motion GRANTED IN PART, and DENIED IN PART, as follows:

1. the claim for breach of implied contract is DISMISSED, with prejudice, as based on the employee handbook—the claim may proceed as based on the 2020 Standards of Conduct and Code of Ethics;

2. the wrongful termination claim is DISMISSED, with prejudice, as based on Defendant's internal policies; and

3. the wrongful termination claim is DISMISSED, without prejudice, as based on anti-kickback sources or theories of public policy.

As a result, this matter shall proceed on Plaintiff's claim for breach of implied contract (as limited above), and her Colorado Wage Act claim.

DATED: October 19, 2023

BY THE COURT:

S. Kato Crews
United States Magistrate Judge